IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| DENICE STEPHANIE KINSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-6072-CV-SJ-REL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Denice Stephanie Kinsey seeks review of the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the administrative law judge (ALJ) erred in (1) evaluating Plaintiff's medically determinable impairment of interstitial cystitis[1] as it related to and supports a mental impairment and as it relates to Plaintiff's ability to perform work activities; (2) determining that Plaintiff's depression was a non-medically determinable impairment and failing to include Plaintiff's anxiety disorder as a severe impairment; (3) determining Plaintiff's mental illnesses did not meet or medically equal listings 12.02, 12.04, or 12.06; (4) failing to adopt the opinion of the treating physician and psychiatric advanced practice registered nurse; (5) mischaracterizing the opinion of Plaintiff's sister, Dara Donovan; (6) failing to comply with the Commissioner's policies in evaluating the severity of Plaintiff's fibromyalgia; and (7) failing to address and give proper weight to the testimony of the vocational expert that Plaintiff was unemployable. I find that there is substantial evidence for the ALJ's decision. Therefore, Plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

---

[1]Long-term inflammation of the bladder wall.

# I.    BACKGROUND

On June 18, 2009, Plaintiff applied for disability insurance benefits and supplemental security income benefits alleging that she had been disabled since May 29, 2009 (Tr. 176-86). Plaintiff's alleged disability stemmed from a C-4 fracture, post-traumatic brain injury, difficulty remembering, and being easily overwhelmed (Tr. 200-01). Plaintiff's applications were denied. On June 11, 2010, a hearing was held before an ALJ (Tr. 39-113). On August 19, 2010, the ALJ found that Plaintiff was not under a "disability" as defined in the Act (Tr. 14-25). On June 3, 2011 the Appeals Council denied Plaintiff's request for review (Tr. 1-3). Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

# II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson

v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

         Yes = not disabled.
         No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

         No = not disabled.
         Yes = go to next step.

3

3.       Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.       Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.       Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of Plaintiff and vocational expert Herman Litt, in addition to documentary evidence admitted at the hearing.

## A.    EARNINGS RECORD

The record shows that Plaintiff earned income from 1992 through 2010, as reflected below in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|------|----------------|------------------|
| 1992 | $ 366.49 | $ 645.65 |
| 1993 | 6,522.90 | 11,393.45 |
| 1994 | 1,315.97 | 2,238.51 |
| 1995 | 2,268.62 | 3,710.27 |
| 1996 | 2,743.09 | 4,277.08 |
| 1997 | 1,103.17 | 1,625.25 |
| 1998 | | |
| 1999 | 2,489.01 | 3,300.63 |
| 2000 | 21,315.30 | 26,784.63 |
| 2001 | 26,310.56 | 32,291.28 |
| 2002 | 28,180.06 | 34,242.32 |

4

| | | |
|---|---:|---:|
| 2003 | 16,497.50 | 19,568.19 |
| 2004 | 783.22 | 887.73 |
| 2005 | 26,807.67 | 29,312.33 |
| 2006 | 28,796.93 | 30,103.79 |
| 2007 | 30,611.58 | 30,611.58 |
| 2008 | 33,088.09 | 33,088.09 |
| 2009 | 15,443.44 | 15,443.44 |
| 2010 | | |

(Tr. 187-88).

B.      ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

1.      June 25, 2009, Disability Report - Field Office - Form SSA-3367, claiming the disability onset date of May 29, 2009 and reporting that Plaintiff had difficulty providing information to the Social Security interviewer (Tr. 197-99).

2.      Undated Disability Report - Adult - Form SSA-3368, summarizing the work Plaintiff did as an LPN, which included walking or standing for six hours per day; sitting or climbing for one hour per day; stooping, kneeling, or crouching for two hours per day; handling, grabbing, or grasping big objects for twelve hours per day; lifting one hundred pounds or more and frequently lifting fifty pounds or more; and supervising two to three people for eight hours a day (Tr. 200-07).

3.      July 9, 2009, Function Report - Adult, summarizing Plaintiff's daily activities, personal care activities, and ability to prepare meals (Tr. 211-19).

4.      Undated Missouri Supplemental Questionnaire, summarizing Plaintiff's upcoming appointments since she filed her claim, her inability to play video games, her ability to drive, and the fact that she had a driver's license (Tr. 220-22).

5

5.      Undated Work History Report, describing Plaintiff's work as an aide and med tech in nursing homes from 1992 to 1997, and Plaintiff's work as an LPN in nursing homes from 1999 to May 2009 (Tr. 223-35).

6.      July 18, 2009, Function Report - Adult - Third Party, summarizing Kurt Kinsey's opinion as to Plaintiff's daily activities, ability to take care of her own personal hygiene, and ability to prepare meals and take care of housework (Tr. 236-44).

7.      Undated Disability Report - Field Office - Form SSA-3367, stating the fact that Plaintiff was reapplying and previous determinations showed no presumptive disability (Tr. 245-47).

8.      Undated Disability Report - Appeal - Form SSA-3441, summarizing changes in Plaintiff's condition, including an increase in pain, agitation, and depression, as well as an updated version of her medical records (Tr. 248-55).

9.      On September 10, 2009, J.B. McConville, M.D., examined Plaintiff for DDS (Tr. 436-39). Dr. McConville recounted Plaintiff's motor vehicle accident and injuries and her placement on disability in 2004, followed by Plaintiff going back to work after vocational rehabilitation and a private tutor to help her relearn skills (Tr. 436). Plaintiff reported that she had to quit working in May 2009, due to various problems relating to her previous injuries, and she recounted a long history of PTSD,[2] an abusive marriage, chronic back spasms, chronic neck and back pain, chronic headaches that were worse with stress, leg cramps, numbness in her hands and feet, muscle spasms, flashbacks, back problems, and a problem with her sacroiliac joint[3] (Tr. 436). Additionally, Plaintiff reported depression at times, frequent panic attacks, short attention span, difficulty with learning, cognitive impairment, allergies,

---

[2] Post-traumatic stress disorder

[3] The sacroiliac joint is a pelvis joint.

6

dysmenorrheal,[4] and asthma (Tr. 437).

Dr. McConville observed that Plaintiff was apprehensive, had a flight of ideas with a short attention span and some cognitive impairment (Tr. 438). The doctor opined that Plaintiff had: (1) SIP[5] C2 fracture cervical spine in a motor vehicle accident; (2) SIP concussion in a motor vehicle accident along with other injuries; (3) PTSD; (4) chronic back and neck pain; and (5) carpal tunnel syndrome (Tr. 438-39).

10. On November 2, 2009, Plaintiff saw James L. Tichenor, Ph.D., for a psychological evaluation at the request of DDS (Tr. 450-51). Plaintiff was observed to be alert and vigilant, had a mild hearing problem, was unsure of the doctor's location or the doctor's last name, could not identify events in the news, had low-average attention and concentration, refused to attempt serial sevens,[6] appeared to have near average immediate memory, refused to discuss remote events like her childhood or possible abuse, had limited abstraction ability, engaged in pressure of thought at times, repeatedly indicated her dissatisfaction with having to be there, her thought process revealed a general dissatisfaction with having to deal with authority figures, her mood was tearful at times when questioned about abuse but she indicated that she was generally happy, and her insight and judgment were somewhat limited (Tr. 451).

Plaintiff refused to talk about her childhood or say anything about possible abuse, later indicating that she thought her mother was "psychotic" but would not otherwise elaborate (Tr. 451). Plaintiff reported nightmares and flashbacks that had decreased greatly since moving to another town, and acknowledged past psychological interventions adding: "I am tired of all

---

[4] Dysmenorrheal is the occurrence of painful cramps during menstruation.

[5] SIP here may stand for short inventory of problems.

[6] Serial sevens, counting down from one hundred by sevens, is a clinical test used to test mental function, especially after possible head injury.

that crap [because] people deal with their problems differently" (Tr. 451).

Dr. Tichenor concluded that Plaintiff was an "angry emotionally labile individual who appeared quite frustrated with her current life situation" (Tr. 451). The doctor opined that "her ability to understand and remember instructions, to attend to and complete tasks, and to interact socially and adapt are likely somewhat lowered but [are] not precluded." (Tr. 451). The doctor diagnosed: PTSD, borderline personality disorder, neck pain, relational problems with mother, unemployment, inadequate finances, unwillingness to seek psychological counseling, and a GAF of 70[7] (Tr. 451).

11.    On June 4, 2010, Plaintiff's treating physician, Kenneth Richards, D.O., filled out a Medical Source Statement Physical and opined that Plaintiff had the following limitations: (1) lift 20 pounds occasionally and 10 pounds frequently; (2) stand or walk less than 2 hours in an 8-hour workday; (3) sit less than about 6 hours in an 8-hour workday; (4) limited in upper extremities; (5) never climb, balance, crouch, crawl, or stoop, and occasionally kneel; (6) limited to occasionally in reaching, handling, fingering, and feeling; and (7) limited in temperature extremes, dust, vibration, humidity or wetness, hazards, fumes, and the like (Tr. 559-62). Dr. Richards concurred with an alleged onset date of May 29, 2009 (Tr. 562).

12.    On June 5, 2010, Cynthia Mayberry, APRN, Plaintiff's treating psychiatric nurse, filled out a Medical Source Statement Mental evaluation and opined that Plaintiff had the following limitations: (1) marked limitations in understanding, remembering, and carrying out simple instructions, as well as making judgments on simple work-related decisions; (2) extreme limitations in understanding, remembering, and carrying out complex instructions; (3) moderate limitations in interacting appropriately with supervisors and co-workers; (4)

_____

[7]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) <u>or</u> some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

marked limitations in interacting appropriately with the public; (5) extreme limitations in responding appropriately to usual work situations and to changes in a routine work setting; (6) ability to focus and concentrate; depression; (7) severe PTSD with panic attacks (Tr. 564-66). Nurse Mayberry concurred with an alleged onset date of May 29, 2009 (Tr. 565).

13.     On October 13, 2009, Paula Kaiser completed a Residual Functional Capacity Assessment and recorded the following physical restrictions for Plaintiff: (1) occasionally lift 50 pounds, or frequently lift 25 pounds; (2) stand or walk about 6 hours in an 8-hour workday; (3) no limit in push or pull; (4) frequently climb ramps or stairs and occasionally climb ladders, ropes, or scaffolds; (5) frequently balance, kneel, and crouch, and occasionally stoop and crawl; and (6) limit in reaching overhead to not more than frequently (Tr. 442-47).

14.     On November 5, 2009, Glen Frisch, M.D., completed a Psychiatric Review Technique and found that Plaintiff had the following limitations: impairments not severe; 12.06 anxiety-related disorders and 12.08 personality disorders (Tr. 452-62). Additionally, the Psychiatric Review Technique ruled out PTSD under anxiety-related disorders and also ruled out borderline personality disorder under personality disorders (Tr. 462). Plaintiff's functional limitations were listed as mild for restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace (Tr. 460).

15.     On August 30, 2010, Plaintiff saw Henry Dennis Mollman, M.D., for a neurological consultation (Tr. 617-20). The doctor observed that Plaintiff's neck disability index was 74%. He opined that her C2 fracture was well-healed and that the main component of her pain appeared to be more muscular than radiating from vertebral bodies. The doctor recommended exercises for the neck. The doctor noted that Plaintiff was upset with him because his findings did not support disability.

9

C.    SUMMARY OF MEDICAL RECORDS

Following a motor vehicle accident in which she was an unrestrained driver in a collision rollover, Plaintiff was admitted to the University Of Missouri Hospital from August 7, 2003, through August 13, 2003, for general surgery for multi-trauma (Tr. 286-89). Plaintiff sustained a C2 hangman's fracture[8] (Tr. 290; 319; 328-31), left lateral orbital fracture,[9] rim intact left maxillary wall fracture[10] (Tr. 296; 320), incomplete, nondisplaced fracture of the scapula[11] (Tr. 312), and a splenic laceration[12] (Tr. 317). A psychiatric consultation observed that following the motor vehicle accident, a note was found in Plaintiff's car "suggestive of a suicidal ideation and attempt," and found Plaintiff to be agitated and not listening to the nurses (Tr. 351). Plaintiff explained that she needed to go home to take care of her children, denied suicidal or homicidal ideation, and claimed not to recall writing the note (Tr. 351).

On August 28, 2003, Plaintiff went to the University of Missouri Hospital and Clinics and had a follow-up visit after being released from the hospital (Tr. 358). She had no memory of the crash (Tr. 358).

On October 4, 2003, Plaintiff went to the University of Missouri Health Care and

---

[8] A hangman's fracture is a fracture of the axis vertebra (C2).

[9] A left lateral orbital fracture is a fracture of the eye socket bone.

[10] A rim intact left maxillary wall fracture is a fracture of the facial bones.

[11] A nondisplaced scapula fracture is a fracture of the shoulder that remains properly aligned.

[12] A splenic laceration is a torn, ragged wound in the spleen.

complained that she was losing weight and her halo vest[13] seemed loose (Tr. 413-414). A CT[14] of Plaintiff's cervical spine showed good alignment (Tr. 416).

On September 2, 2003, Plaintiff visited the orthopaedic clinic at the University of Missouri Health Clinic to follow up her scapula fracture, which was mending (Tr. 420-21).

On September 11, 2003, Terry J. Ryan, M.D., examined Plaintiff and concluded she was doing well neurologically, her C2 fracture was healing well, and she needed to continue with the halo brace and remain off work (Tr. 357). A CT of the cervical spine showed a healing C2 fracture (Tr. 419).

On November 6, 2003, Plaintiff visited the neurosurgery clinic of the University of Missouri Health Care to discuss removal of the halo (Tr. 409-10). A CT showed there was an estimated 304 millimeter forward displacement of C2 on C3 without soft tissue[15] swelling and

---

[13] A halo is a ring that encircles the head and is fixed to it by means of pins that are inserted in the head.

Halo traction brace with padded plastic jacket

[14] A CT is a computer-processed x-ray that produces "slices" of specific body areas.

[15] Soft tissue refers to tissues that connect, support, surround other structures and organs of the body, not being bone.

11

a 1.5 millimeter anterior subluxation[16] of the C2 on C3 (Tr. 411-12).

On December 18, 2003, Kenneth L. Rall, M.D., at the University of Missouri Health Care reported that Plaintiff's fracture of the C-2 was unchanged (Tr. 408).

On January 1, 2004, Plaintiff visited the neurological surgery clinic at the University of Missouri Health Care complaining of dizziness, and she was directed to wean herself from the cervical collar[17] and return to work at light duty for two weeks as tolerated (Tr. 402-03). A MRI[18] of Plaintiff's brain confirmed sphenoid sinus disease[19] and right anterior intranasal or maxilla bone cyst[20] (Tr. 404-05). An MRA[21] of Plaintiff's neck and head was negative (Tr. 406).

On January 29, 2004, Plaintiff visited the audiology clinic at the University of Missouri Hospital and Clinics complaining that she had nausea and dizziness with body/head movements since the motor vehicle accident; had earaches; had migraine headaches that felt like frontal squeezing pain at the temple, which light and sound made worse; and usually

---

[16]Anterior subluxation is a localized disruption of the cervical spine.



[17] A cervical collar is worn around the neck to offer support for pinched nerves.

[18] An MRI is a scan of the body that uses magnets and radio frequency fields to produce images of the body.

[19] Sphenoid sinus disease is an inflammatory disease of the sinus region.

[20] A cyst is a closed sac, having distinct membrane and division compared to the nearby tissue, which may contain air, fluids, or semi-solid material. Intranasal cysts are found within the nasal structure, and maxilla bone cysts are found on the upper jaw bone.

[21] An MRA is a type of MRI scan that provides pictures of blood vessels inside the body.

12

could not breath or smell through her nose (Tr. 367-70; 399-401). Plaintiff was noted to have a sphenoid cyst[22] (Tr. 373; 397; 395-96).

On June 14, 2004, Plaintiff went to the University of Missouri Health Care and indicated that her headaches had improved with Neurontin,[23] but she still had nasal congestion, unsteadiness, lack of coordination, and "head swelling." (Tr. 371-72).

On September 1, 2004, Plaintiff visited the neurology clinic of the University of Missouri Health Care for preoperative clearance for sphenoid surgery (Tr. 392-94). Plaintiff revealed that after she was sent home from the hospital after the accident, she experienced retrograde amnesia,[24] was unable to recognize her children, and was having praxic[25] problems in the form of being unable to carry out her house chores, dress herself, and take care of her personal hygiene (Tr. 393). Plaintiff reported that she could then do all of those tasks, but she still complained of daily headaches that were low grade every day but became severe three times a week and lasted for a few hours (Tr. 393). Plaintiff was cleared for surgery but advised to follow up with a neurologist for her headaches (Tr. 394).

On October 4, 2004, an ENT at the University of Missouri Health Care reported Plaintiff continued to have sinusitis[26] symptoms, headaches, problems with memory loss, and neck pain; and the ENT recommended a MRI and neurosurgery consult (Tr. 365-66).

---

[22] A sphenoid cyst is a cyst in the sinus region.

[23] Neurontin is used to treat neuropathic pain due to nerve damage.

[24] Retrograde amnesia is a loss of access to events that occurred before an injury.

[25] Praxic is defined as to do; action; activities.

[26] Sinusitis refers to inflammation of the sinuses that occurs with a viral, bacterial, or fungal infection.

13

On October 4, 2004, a doctor at the otolaryngology clinic of the University of Missouri Health Care noted that Plaintiff had an inflammatory lesion[27] of the right sphenoid and wanted to schedule surgery, but the doctor wanted her to first see neurosurgery about her neck pain and constant complaints of headaches (Tr. 386).

On October 27, 2004, the University of Missouri Health Care reported that three views of Plaintiff's cervical spine revealed very minimal anterior subluxation of the C2 on C3, increased sclerosis[28] of posterior elements of the C2, and lucency[29] seen on extension (Tr. 391).

On November 1, 2004, otolaryngology at the University of Missouri Health Care evaluated Plaintiff and decided to do a MRI and MRA (Tr. 389-90).

On November 8, 2004, the University of Missouri Health Care reported that an MRI of Plaintiff's neck was negative (Tr. 388).

On November 9, 2004, Plaintiff showed up at the University of Missouri Health Care for a right sphenoidotomy,[30] right total ethmoidectony,[31] right MMA[32] and septoplasty,[33] which did not take place because the doctor did not feel that her headaches were sinus-related (Tr. 387).

---

[27] An inflammatory lesion is damaged tissue accompanied by inflammation.

[28] Sclerosis is the hardening of tissue.

[29] A lucency on an x-ray image represents an area absorbing less radioactive energy than the surrounding tissue. Lucent areas appear dark compared to the surrounding area.

[30] Sphenoidotomy is the surgical creation of an opening in the sphenoid sinus.

[31] A right total ethmoidectony is the removal of the anterior wall of the sphenoid sinus.

[32] An MMA would be done in cases of apnea to move the tongue and jaw forward so that they cannot fall back and close the throat off causing apneas.

[33] Septoplasty is a corrective surgical procedure done to straighten the nasal septum, the partition between the two nasal cavities.

14

On December 6, 2004, Plaintiff went to the University of Missouri Health Care and reported constant pain, worse in the morning and at night (Tr. 375-77).

On December 29, 2004, Plaintiff saw a neurologist at the University of Missouri Health Care about her headaches, which occurred on a daily basis and were associated with photophobia[34], phonophobia[35], photopsia[36], and metamorphopsia[37], and which neither Tylenol nor Anacin had relieved (Tr. 384). The neurologist concluded Plaintiff had migraine headaches with aura[38] as well as post-concussion syndrome, and the doctor prescribed Topomax[39] and Imitrex[40] (Tr. 385).

On March 7, 2005, Plaintiff went to the University of Missouri Health Care and complained of pain at level four due to headaches. The ENT doctor noted that she was free of previous headaches and postnasal drainage but she continued to have nasal airway obstruction, and he opined her headaches were most likely post-traumatic headaches (Tr. 378-79).

On April 27, 2005, Plaintiff went to the University of Missouri Health Care neurology care clinic to follow up on her headaches which were improved, and she was prescribed

---

[34] Photophobia is a symptom of abnormal intolerance to visual perception of light.

[35] Phonophobia is a fear of loud sounds.

[36] Photopsia is the presence of perceived flashes of light.

[37] Metamorphopsia is a type of distorted vision in which a grid of straight lines appears wavy and parts of the grid may appear blank.

[38] An aura is a perceptual disturbance experienced by some migraine sufferers before a migraine headache.

[39] Topomax is used to treat epileptic seizures.

[40] Imitrex is used to treat the symptoms of migraine headaches.

15

Topamax and Relpax[41] (Tr. 380-81). At that time, Plaintiff's headaches occurred about once a week and lasted for several hours (Tr. 380).

On April 29, 2008, Plaintiff went to see B. Kevin Knowles, D.O., and requested that Dr. Knowles increase her 40-pound lifting restriction, which he agreed to do without the benefit of an MRI or x-ray (Tr. 433).

On November 6, 2008, Plaintiff saw Dr. Knowles with complaints of constant neck pain at base of her head (Tr. 432). She was prescribed Ultram[42] and Soma[43] (Tr. 432).

On June 10, 2009, Plaintiff saw Dr. Knowles with complaints of back pain and muscle spasm (Tr. 431). She was again prescribed Ultram and Soma (Tr. 431).

On July 29, 2009, Plaintiff had a psychiatric evaluation at First Choice Professionals, which was signed by Delores Lesseigh, APRN and Jeffrey Harden, D.O., a psychiatrist (Tr. 571-73). Plaintiff revealed that she had no memory of many things that happened to her, but knew that she nearly died of a broken neck and had rope burns around her neck in connection with the broken neck (Tr. 571). Plaintiff reported that she had been told by some family members that her husband had tried to kill her, and that other family members reportedly told her that she had tried to hang herself (Tr. 571). She knew, however, that her ex-husband was in prison for raping their daughter and attempting to kill her and the children (Tr. 571). Plaintiff explained that her past was coming back in bits and pieces (Tr. 571).

Plaintiff also revealed that she had a chaotic childhood in which both parents were alcoholics, her parents divorced and then remarried each other on three separate occasions, her mother left her and her siblings with their grandparents for a year, she was sexually

---

[41] Relpax is used to treat the symptoms of migraine headaches.

[42] Ultram is used to relieve moderate to moderately severe pain.

[43]Soma is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.

16

abused by her grandfather at age five and her mother told her it was her fault, her mother sent

her to foster care at some point, and her brothers once shaved her head and tied her up naked

(Tr. 571).

Plaintiff's mental status examination revealed that she was fidgeting but forthcoming

except for details about her abuse. Plaintiff reported having an impulse control problem, got

very agitated, could not be around groups, had no control over her impulses, had trust issues,

and was emotionally labile with no control over crying episodes. Plaintiff reportedly had

difficulty eating, her energy level and motivation were hyper, her concentration was extremely

poor, her memory was a huge problem, and her sleep was poor. Plaintiff reportedly had

nightmares and flashbacks, a history of panic attacks and significant anxiety (Tr. 572).

Plaintiff was diagnosed with PTSD, severe; cognitive dysfunction, not otherwise

specified; anxiety, not otherwise specified; traumatic brain injury, status post fractured cervical

vertebrae; and chronic pain per report (Tr. 572). The examiners opined: "Ongoing

psychotherapy is recommended although it is doubtful Ms. Kinsey would pursue this option

because of her fear of remembering details. Mental exercises to improve her cognitive

functioning would also be beneficial" (Tr. 573). At the time of this examination, Plaintiff had a

GAF of 45[44] (Tr. 572).

On October 15, 2009, Plaintiff went to Northeast Regional Medical Center and had a

CT of the face/head that showed chronic sinusitis with occlusion of the native ostiomeatal[45]

drainage pathways and prominent nasal septal deviation left with large concha bullosa of the

---

[44]A GAF (global assessment of functioning) of 45 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

[45]Ostiomeatal refers to the nasal passages.

right middle turbinate[46] (Tr. 539-40).

On November 16, 2009, Plaintiff saw Kenneth D. Richards, D.O., complained of "pain everywhere" and was observed to be "very depressed." (Tr. 470). Dr. Richards started Plaintiff on Prozac,[47] added Vistaril[48] and continued Glucosamine[49] (Tr. 470)

On November 19, 2009, Plaintiff went to Dr. Knowles complained of back pain and spasms, and reported that Ultram and Soma were not working for her (Tr. 477). Plaintiff was prescribed Skelaxin[50] (Tr. 477).

On November 21, 2009, Plaintiff went to the Northeast Regional Medical Center and underwent sinus surgery (Tr. 542; 544-46).

On December 14, 2009, Plaintiff saw Dr. Richards and said that she was experiencing neck pain, could not lift a milk jug, had stopped taking Prozac because it made her feel worse, was aggressive and agitated, and had stopped taking Vistaril (Tr. 469).

On January 4, 2010, Plaintiff saw J. Todd Sylvara, D.O., and complained of cysts on her ovaries, heavy periods, and migraines (Tr. 510). Plaintiff was referred to Ralph Boling, D.O., for a pelvic ultrasound (Tr. 511).

On January 5, 2010, Plaintiff went to the Northeast Regional Medical Center where an

---

[46]A concha bullosa is an air-filled cavity within the right narrow and curled bone shelf that protrudes into the breathing passage of the nose.

[47]Prozac helps treat mood problems such as depression, obsessive compulsive disorder and panic attacks.

[48] Vistaril is used to relieve the itching caused by allergies and to control nausea and vomiting.

[49]Glucosamine is a dietary supplement promoted to keep joints healthy and working smoothly.

[50] Skelaxin is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.

18

ultrasound was performed that showed Plaintiff's uterus was anteflexed and anteverted,[51] with no obvious uterine masses, and the left ovarian cyst was simple (Tr. 512-13).

On January 11, 2010, Dr. Boling observed that Plaintiff had a tender bladder and minimally tender uterus, and he performed an endometrial biopsy[52] (Tr. 36; 517; 521-22).

On January 12, 2010, Plaintiff saw Cynthia Mayberry, APRN, First Choice Professionals, and reported that she had tried many medications but only low doses of benzodiazepens[53] worked for her (Tr. 570). Plaintiff talked about past trauma and rejection by family, but she hoped that her family might change (Tr. 570). Plaintiff was diagnosed with PTSD, severe major depression - recurrent, generalized anxiety disorder, and cognitive disorder (Tr. 570).

On January 13, 2010, Plaintiff saw Dr. Richards and reported low back pain, hip pain, and neck pain (Tr. 471). They discussed concerns abut Darvocet use by a patient with a history of multi-substance abuse (Tr. 471).

On January 29, 2010, Dr. Boling performed a D&C,[54] hysteroscopy,[55] a thermal ablation of the endometrium[56], and a cystoscopy of the bladder[57] using hydrodilation with

---

[51] The uterus is bent and tipped forward in the abdominal cavity.

[52] In an endometrial biopsy, a doctor takes a small sample of the lining of the uterus.

[53] The benzodiazepine family of depressants is used to produce sedation, induce sleep, relieve anxiety and muscle spasms, and to prevent seizures.

[54] A D&C is a uterine scraping.

[55] Hysteroscopy is the inspection of the uterine cavity by endoscopy with access through the cervix.

[56] The endometrium is the inner membrane of the uterus.

[57] A cystoscopy is a test that allows a doctor to look at the inside of the bladder and the urethra using a thin, lighted instrument.

19

DMSO solution[58] (Tr. 553-54).

On February 1, 2010, Plaintiff called Dr. Boling and reported that she could not take Atarax[59] because it made her aggressive, and asked for refills of Valium[60] (Tr. 520). The doctor told Plaintiff to stop Atarax but he refused to refill the Valium (Tr. 520).

On February 1, 2010, a pathology report from BBL Charilton Lab, LLC, indicated that Plaintiff had an endometrial polyp[61] (Tr. 526).

On February 10, 2010, Plaintiff went to Dr. Richards complaining of back pain and alleging it that began seven years earlier; was persistent; and was located in the upper, middle, and lower portions of her back and neck. Plaintiff complained of pain radiating to the left and right thighs, and described the pain as aching, burning, numbing, and stabbing. Plaintiff said the pain was aggravated by daily activities and over-exertion, and reported that the symptoms were relieved by heat, massage, pain medication, and stretching (Tr. 466). Musculoskeletal findings included non-allopathic lesions of the spine, ribs, and left pelvis, as well as sacral non-allopathic lesion (subluxation) of the right pelvis (Tr. 467). During the medical history portion of the visit, Plaintiff reported the following surgeries:

    1989   Childbirth

    1990   Childbirth

    1994   Childbirth

    1995   Childbirth

---

[58] Hydrodilation with DSMO solution is used to treat interstitial cystitis (long-term inflammation of the bladder wall).

[59] Atarax is used to relieve the itching caused by allergies and to control nausea and vomiting.

[60] Valium is used to relieve anxiety, muscle spasms, and seizures, and to control agitation caused by alcohol withdrawal.

[61] An endometrial polyp is a mass in the inner lining of the uterus.

> 2003   C-spine fracture
>
> 2010   Cystoscope
>
> 2010   Endometrial abalation
>
> 2010   Hystoscope

(Tr. 466).

On February 18, 2010, Plaintiff saw Dr. Boling following her thermal ablation and cystoscopy (Tr. 36; 517). The doctor reported that the cystoscopy revealed interstitial cystitis of a moderate nature (Tr. 36; 517). Urinalysis revealed hematuria (blood in the urine) (Tr. 36; 517). The doctor observed that Plaintiff was on Elmiron[62] but had stopped taking the medication because of weight gain and bladder spasms (Tr. 519).

On March 8, 2010, Plaintiff saw Nurse Mayberry and reported that she was "feeling calmer, happier, and better able to function. Recently ha[d] been able to go out and take walks . . . . Only two episodes with family calling and [was] handling this well. Fearful of going too quickly into trauma and being overwhelmed." (Tr. 569). Plaintiff was diagnosed with PTSD, generalized anxiety disorder and panic (Tr. 569).

On March 10, 2010, Plaintiff saw Dr. Richards and complained of pain in the upper, middle, and lower back and neck, and stated that the pain was shooting and radiating to the left and right thighs (Tr. 575). Plaintiff said that the symptoms were aggravated by ascending and descending stairs, and by walking; and were relieved by applying heat and stretching (Tr. 575). Plaintiff was diagnosed with somatic dysfunction[63] (Tr. 577).

On March 15, 2010, Plaintiff saw Deanna Davenport, APRN, at the rheumatology clinic

---

[62]Elmiron is used to relieve bladder pain and discomfort related to interstitial cystitis, a disease that causes swelling and scarring of the bladder wall.

[63]Impaired or altered function of related components of the somatic (body framework) system: skeletal, arthrodial, and myofascial structures, and related vascular, lymphatic, and neural elements.

(Tr. 587). Dr. Knowles had referred Plaintiff to the clinic for evaluation and treatment of possible fibromyalgia (Tr. 587). Plaintiff explained that she had experienced increasing trouble with muscle pain and upper body weakness due to a C2 fracture in 2003 (Tr. 587-88). Plaintiff reported that she was experiencing pain in the region from her occipital skull to her mid-back, around her pelvis, and in her right leg. Plaintiff also reported morning stiffness for about one to two hours and frequent gelling. Plaintiff said that Tramadol[64] and Soma had helped to some degree. She also indicated that cold and increased physical activity aggravated the pain, but that heat was somewhat soothing (Tr. 588). A review of Plaintiff's systems was positive in almost every area (Tr. 588). Nurse Davenport noted 14 of 18 fibromyalgia tender points present (Tr. 589), opined it was "highly likely" Plaintiff had fibromyalgia (Tr. 589-90), and reasoned that Plaintiff's depression and anxiety could be aggravating her fibromyalgia (Tr. 590). Nurse Davenport wanted to rule out connective tissue disease since Plaintiff was having joint pain and dry eyes and mouth (Tr. 590). An x-ray of Plaintiff's lumbosacral spine showed "mild interval progression of lower lumbar spondylotic changes [and] [m]ild loss of L4-5 and L5-S1 disc height with associated slight endplate irregularity at these levels and mild associated facet arthropathy." (Tr. 600). In the social segment of the report, Plaintiff reported chewing tobacco, denied drinking alcohol or abusing other drugs, and said she had tattoos (Tr. 589). Plaintiff reported having a 14-year-old son still at home (Tr. 589).

On April 7, 2010, Plaintiff saw Dr. Richards and complained of pain in the upper, middle, and lower back and neck. Plaintiff said that the pain radiated to the left and right thighs and was an ache. Plaintiff reported that her symptoms were aggravated by bending, lifting, and sitting, and were relieved by moving and stretching (Tr. 578).

On April 9, 2010, Plaintiff saw Nurse Davenport for a follow-up visit. Plaintiff was

_____

[64] Tramadol is used to relieve moderate to moderately severe pain.

22

diagnosed with fibromyalgia. Plaintiff was noted to have a positive ANA,[65] osteoarthritis in her low back that appeared to have worsened over the years, and interstitial cystitis (Tr. 591-94). Nurse Davenport explained that the fibromyalgia seemed to progress out of Plaintiff's neck injury and was aggravated by poor sleep, depression, and vitamin D deficiency. Nurse Davenport recommended Cymbalta for pain and mood, vitamin D, and mild daily aerobic activity (Tr. 594).

On April 20, 2010, Plaintiff saw Dr. Boling, for a recheck of interstitial cystitis, and it was noted her urinalysis was negative for blood (Tr. 36; 517). Plaintiff was switched to Cymbalta for pain, and her Elavil was increased to regulate the bladder pain nerve fibers (Tr. 36; 517). Because she did not tolerate Atarax, Plaintiff was prescribed Elimron to be taken twice daily (Tr. 36; 517). She reported problems urinating (Tr. 518).

On May 7, 2010, Plaintiff saw Dr. Richards with complaints of pain in the upper, middle, and lower back, described as achy and dull with no aggravating or relieving factors (Tr. 581). Dr. Richards noted that Plaintiff was uncomfortable and that she had more than 18 myofascial trigger points of fibromyalgia syndrome (Tr. 582).

On May 12, 2010, Plaintiff had a CT taken of her cervical spine, which showed no acute osseous [boney] abnormality (Tr. 556).

On June 7, 2010, Plaintiff met with Nurse Davenport and reported that her Amitriptyline[66] dose had been increased by her urologist and that this was aggravating her PTSD mood and flashback issues (Tr. 595). Nurse Davenport recommended that Plaintiff speak

---

[65] ANA stands for "antinuclear antibody," an unusual antibody directed against structures within the nucleus of the cell. ANAs are found in patients whose immune system is predisposed to cause inflammation against their own body tissues. Antibodies that are directed against one's own tissues are referred to as autoantibodies. The propensity for the immune system to work against its own body is referred to as autoimmunity.

[66]Amitriptyline is used to treat symptoms of depression and insomnia.

23

with her urologist about switching the medication to help with her sleep, but Plaintiff responded that the urologist felt that the Amitriptyline was very important for the treatment of her interstitial cystitis (Tr. 595-96). Plaintiff was having trouble with sleep and was having night sweats (Tr. 596). Plaintiff reported that she continued to have widespread musculoskeletal pain and that her mood was somewhat aggravated since her last visit (Tr. 596). Nurse Davenport worried that the Cymbalta and Amitriptyline were aggravating Plaintiff's PTSD but did not want to discontinue them if they were beneficial to Plaintiff's treatment (Tr. 596-97).

On June 8, 2010, Plaintiff saw Nurse Mayberry and reported seeing a change in her boyfriend, severe pain in her leg and back, headaches, anxious/depressed mood, increased appetite, problems with sleeping/motivation/concentration, some nightmares, occasional flashbacks, frequent anxiety, and worrying all the time (Tr. 284). Diagnoses included PTSD and generalized anxiety disorder with panic. Nurse Mayberry noted Platiniff's primary care physician would manage her medications (Tr. 284).

On June 8, 2010, Plaintiff saw Dr. Richards for back and neck pain that was described as achy, dull, numbing, sharp, and throbbing (Tr. 601-13). Examination revealed nonallopathic lesions on Plaintiff's thoracic spine, lumbar spine, left rib, left pelvis and right pelvis (Tr. 602). She was diagnosed with somatic dysfunction in her thoracic, lumbar and sacral spine, pelvis and in her ribs (Tr. 602).

On June 15, 2010, Plaintiff saw Dr. Knowles about her medications. The doctor wanted to change Plaintiff's Valium for Ambien[67] (Tr. 32). Plaintiff's intolerance to Amitriptyline was noted (Tr. 32).

On June 16, 2010, Plaintiff saw Dr. Boling for recheck of interstitis cystitis, and it was

---

[67] Ambien is used to treat insomina.

noted that her urine was negative for blood (Tr. 36). Plaintiff reportedly did not do well on Cymbalta or Elavil[68] and therefore those medications were stopped. Plaintiff was directed to continue Elmiron and to use Diazepam as needed for anxiety (Tr. 36).

On July 7, 2010, Plaintiff saw Dr. Richards for achy and dull back pain (Tr. 604-06). Examination revealed nonallopathic lesions to the cervical spine, thoracic spine, lumbar spine, left and right ribs, and left and right pelvis (Tr. 605). Plaintiff was diagnosed with somatic dysfunction of the head, cervical spine, thoracic spine, lumbar spine, sacrum, pelvis and ribs (Tr. 605).

On July 13, 2010, Plaintiff saw Nurse Mayberry and reported having some nightmares, frequent flashbacks, frequent anxiety, frequent obsessions, and somatic complaints (Tr. 283). Diagnoses included severe PTSD, major depression - recurrent, generalized anxiety disorder and cognitive dysfunction (Tr. 283). Plaintiff was instructed to maintain the medications started by her primary care provider (Tr. 283).

On July 14, 2010, Plaintiff complained to Dr. Knowles about Ambien causing her to sleep walk, and therefore the doctor changed the prescription to Darvocet[69] (Tr. 31).

On August 2, 2010, Plaintiff saw Nurse Davenport to follow up on her fibromyalgia. Plaintiff reported an increase in neck pain for the past three and a half weeks (Tr. 613-23). The stiffness and pain in her neck was going up her head and causing migraines. Plaintiff reported that she had opted to discontinue Cymbalta due to increased emotionality and that Dr. Knowles had stopped her Amitriptyline, but she was then experiencing more bladder spasms. Chronic dysuria and hematuria[70] continued. Plaintiff was taking two Darvocet to sleep because

---

[68] Elavil is used to treat symptoms of depression.

[69] Darvocet is used to relieve mild to moderate pain, and it contains acetaminophen and propoxyphene.

[70] Dysuria is painful urination; hematuria is the presence of red blood cells in the urine.

Case 5:11-cv-06072-REL    Document 16    Filed 09/28/12    Page 25 of 44

Ambien had made her sleep walk. Plaintiff exhibited 18 of 18 fibromyalgia tender spots and was very tender to the touch. Nurse Davenport opined that Plaintiff's fibromyalgia syndrome was being aggravated by her interstitial cystis and its treatment, and that her neck pain could be progression of her osteoarthritis or a localized fibromyalgia syndrome flare. Nurse Davenport noted that a fighting mood coupled with sleep issues, neck pain and an inability to exercise, was not a good combination for someone with fibromyalgia syndrome. Nurse Davenport was going to refer Plaintiff to a neurologist to re-evaluate her neck fracture (Tr. 613-23).

On August 4, 2010, Plaintiff saw Dr. Richards for achy and dull pain throughout her back and neck (Tr. 607-08). Plaintiff reported that symptoms were aggravated by bending, sitting, standing, and walking; she denied any relieving factors (Tr. 607). Examination revealed nonallopathic lesions to the skull, cervical spine, thoracic spine, lumbar spine, left and right ribs, and left and right ribs (Tr. 608).

On August 10, 2010, Plaintiff saw Nurse Mayberry and reported having flashbacks (Tr. 282). They discussed letting go of Plaintiff's anger. Plaintiff was instructed to follow up bimonthly (Tr. 282).

On August 24, 2010, Plaintiff saw Nurse Mayberry and reported having a rough two weeks and that she was thinking about extending her appointment to once a month (Tr. 281). Plaintiff again focused on 2003 events and her need to change her family, instead of focusing on the pain and ways to let it go (Tr. 281).

On September 1, 2010, Plaintiff saw Dr. Richards for pain throughout her back that was achy and dull, and that was aggravated by bending and lifting (Tr. 610-13). Examination revealed nonallopathic lesions to the cervical spine, thoracic spine, lumbar spine, left and right rib, and left and right pelvis (Tr. 611). Assessment included somatic dysfunction to the head, cervical spine, thoracic spine, lumbar spine, sacrum and pelvis (Tr. 611).

On September 7, 2010, Plaintiff saw Nurse Mayberry and reported that she continued to struggle with emotions and pain throughout her body (Tr. 280). They discussed letting go of the pain (Tr. 280). Plaintiff was diagnosed with severe PTSD, major depression - recurrent, generalized anxiety disorder and cognitive dysfunction (Tr. 280).

On September 21, 2010, Plaintiff saw Nurse Mayberry and reported she was stronger and setting better boundaries, but that she continued to have difficulty letting go (Tr. 279).

On October 5, 2010, Plaintiff saw Nurse Mayberry and reported that she was worried about family problems, but that she was more assertive and strong at home (Tr. 278).

D.      SUMMARY OF TESTIMONY

During the administrative hearing, Plaintiff testified in support of her claim and vocational expert Herman Litt testified at the request of the ALJ.

1.      Plaintiff's testimony

Plaintiff testified that she was 39 years old and a high school graduate (Tr. 45). From 2000-2003, Plaintiff was a full-time LPN; she then left employment and returned to work as an LPN from 2005 until May 29, 2009 (Tr. 46-48).

Plaintiff reported that she had not worked since her alleged onset date (Tr. 48). Plaintiff left her employment because she was injured when lifting a man in distress and her whole right side went limp and locked up (Tr. 48-49). Plaintiff represented that she did not report this injury to her employer because she feared she would get fired (Tr. 48). Despite her injury, Plaintiff managed to work from March to May of 2009 by taking extra pain medication (Tr. 49). Plaintiff said that in May the pain became intolerable and resulted in increased agitation (Tr. 49). Plaintiff reported that she could not continue to take her pain medication because it impaired her judgment (Tr. 49).

Plaintiff testified that she had been previously disciplined at work due to phone usage and incidents of disrespect (Tr. 85). Plaintiff's supervisors told her that she lacked people skills

(Tr. 86). The discipline was discussed on every yearly review (Tr. 86).

As to medication, Plaintiff listed the following: (l) Ultram - 50 milligrams, on average five a day; (2) Soma - 350 milligrams, on average four times a day; (3) Darvocet - 100 milligrams, twice a day as needed but usually only once a day; (4) Ibuprofen - 800 milligrams, three times a day but usually one or two a day; (5) Relpax - 40 milligrams, two or three times a month at various times for her migraines; (6) Cymbalta - 30 milligrams daily; (7) Vitamin D - 50,000 units on a weekly basis; (8) Elavil - lowered from 50 milligrams daily to 25 milligrams daily; (9) Elmiron - 100, twice a day; (10) Valium - 2.5 twice a day; (11) Flonase[71] - two squirts in each nostril daily; (12) Advair[72] - two puffs twice a day; (13) Bactroban[73] at night to the nose on both sides; (14) nose rinse; (15) Glucosamine daily for her joints; (16) Colace[74] - two a night; and (17) Dulcolax[75] (Tr. 49-50). Plaintiff reported that she took all of her medications, which were generally effective (Tr. 64). Plaintiff explained that even after taking her medication none of the symptoms went away, they just became tolerable (Tr. 92-93). Even with her pain medication, Plaintiff testified that her back and neck pain could sometimes reach an 8 on a 10-point scale (Tr. 66). Plaintiff reported that no medical provider ever proposed injections, nerve blocks, or referrals to an orthopedic specialist (Tr. 67).

As to mental impairments, Plaintiff testified that she received mental health counseling,

---

[71] Flonase nasal spray is used to treat the symptoms of seasonal and perennial allergic rhinitis and perennial non-allergic rhinitis.

[72] Advair is used to treat asthma symptoms.

[73] Bactroban is an antibiotic used to treat impetigo as well as other skin infections caused by bacteria.

[74] Colace is a stool softener that is used on a short-term basis to relieve constipation by people who should avoid straining during bowel movements because of heart conditions, hemorrhoids, and other problems.

[75] Dulcolax is used on a short-term basis to treat constipation.

which was effective (Tr. 66). Plaintiff had been receiving treatment from Nurse Mayberry, who was working toward making her "a whole person." (Tr. 91).

As to physical impairments, the ALJ directed Plaintiff to Exhibit 2E, a June 2009 disability report where Plaintiff stated that her status post fracture C2 and post traumatic brain injury were the causes of disability, but no mention was made of back pain (Tr. 52). Plaintiff stated she did not fill out the form but, instead, someone with Social Security filled it out and she could not recall what she said (Tr. 53). When asked why no MRIs or CT scans showed any problems with her back or neck, Plaintiff testified that flat x-rays showed significant changes to her lumbar, sacral, coccyx, and hips (Tr. 55). The ALJ asked why a CT scan performed a month earlier of Plaintiff's cervical spine showed it was normal; and Plaintiff replied that she had another CT scan of her cervical spine two or three days prior to the hearing that showed a heel fracture and a growth on her thyroid (Tr. 55-56).

Concerning her back pain, Plaintiff testified that it began on the top of her head, went down to the base of her shoulders, extended to her the lower back, and eventually went through her hips (Tr. 67; 82; 84). The pain also traveled down her arms to about mid-way to three or four inches above the elbows, and resulted in a burning and tingling sensation (Tr. 82-83). Plaintiff reported that she experienced this pain every day, and that taking medication, using heat packs, and stretching made the pain better (Tr. 83).

Plaintiff stated she had surgery to diagnosis her interstitial cystitis (Tr. 73- 74). Plaintiff stated her symptoms of interstitial cystitis lasted over a year and were very painful (Tr. 75). She described the symptoms as feeling like there was a band around her waist that sent spasms down to her hips and joints (Tr. 75).

Plaintiff reported experiencing migraines on a weekly basis (Tr. 76). When a migraine occurred, Plaintiff reported that she initially took Ibuprofen, later changed to Soma, and then switched to Relpax (Tr. 76). She also indicated that she would go to a room with no light and

29

sound and apply heat packs to her neck (Tr. 76).

As to her mental impairments, Plaintiff testified that she experienced stress when around people (Tr. 70). Plaintiff cried at least twice during the hearing and reported that she had crying spells four to five times a day (Tr. 86-87). According to Plaintiff, her mental health problems began in 2003 and steadily got worse (Tr. 87). Plaintiff reported that she sometimes had crying spells at work and had to leave on one occasion (Tr. 87). Plaintiff indicated that her PTSD stemmed from the abuse she experienced as a child and was reflected in recurring nightmares two to three times a week (Tr. 88). After a nightmare, Plaintiff is agitated, easily startled, and nervous (Tr. 91).

As for her daily activities, Plaintiff testified that she drove a car but only once or twice a month (Tr. 66). Plaintiff reported that she took care of the house, which occupied most of her day (Tr. 68). She cooked, but she occasionally burned herself when reaching for a hot pan (Tr. 68). Plaintiff reportedly did the cleaning, vacuuming, and other housework, but did not do any outside activities or yard work (Tr. 70).

Plaintiff testified that on a typical day, after she awoke and did her range-of-motion exercises, and she would typically dust or vacuum with breaks between the tasks (Tr. 71-72). After dinner, she would usually do the dishes, take a five-minute walk as directed by her rheumatologist, and then would lie down and read for awhile (Tr. 72).

2.    Vocational expert's testimony

Vocational expert Herman Litt testified at the request of the ALJ. The vocational expert testified that the past relevant work for Plaintiff was as a LPN, a semi-skilled job normally performed at the medium exertional level according to the Dictionary of Occupational Titles (DOT) but here it was performed at the heavy exertional level according to Plaintiff (Tr. 47). Although there was a reference dealing with the period from 1992 to 1997 when Plaintiff was working as a medication technician, the vocational expert discounted this position and stated it

did not match up with the earnings (Tr. 47). From 2005 to 2009, Plaintiff worked as an LPN (Tr. 47-48).

The ALJ's first hypothetical asked the vocational expert to assume a claimant with the following restrictions: (1) able to do medium level work (2) with no climbing of ladders, ropes, or scaffolds; (3) occasional climbing of stairs or ramps; (4) occasional crawling; (5) frequent but not continuous overhead reaching bilaterally; and (6) the ability to understand, remember, and carry out detailed but not complex instructions while performing predictable tasks (Tr. 103-04). The vocational expert opined that such a person could perform the past relevant work as an LPN.

The ALJ's next hypothetical asked the vocational expert to assume the same information as above but change the claimant's ability to do medium level work to light level work (Tr. 104). The vocational expert opined that such a person would not be able to do the past relevant work as an LPN but could do other work such as a ticket seller (DOT 211.467-030; 1,000 in the state and 185,000 nationally); a small products assembler (DOT 739.687-030; 1,100 in the state and 205,000 nationally); and an office helper (DOT 239.567-010; 1,000 in the state and 190,000 nationally) (Tr. 105). The vocational expert explained that these three jobs are light and unskilled, but they could also be light and semi-skilled (Tr. 105-106).

The ALJ's third hypothetical asked the vocational expert to assume essentially the same information as above but to lower the exertional level to sedentary (Tr. 106). The vocational expert opined that there would be some sedentary unskilled jobs available for such a person (Tr. 106). Three examples are an optical lens worker (DOT 713.684-038; 800 in the state and 135,000 nationally); a charge account clerk (DOT 205.367-014; 1,000 in the state and 180,000 nationally); and a jewelry preparer (DOT 1700.687-062; 900 in the state and 130,000 nationally).

Plaintiff's counsel then asked the vocational expert to assume the following hypothetical:

31

(1) a person of the same age, education, and work experience as Plaintiff; (2) who could lift 20 pounds occasionally and 10 pounds frequently; (3) limited to standing and walking less than 2 hours out of 8 hours a day; (4) was limited in pushing and pulling with his or her extremities; (5) could never climb, balance, crouch, crawl, stoop, and only occasionally kneel; (6) could occasionally reach, handle, finger, and feel; and (7) should have no exposure to temperature extremes, dust, vibration, humidity, wetness, hazardous machinery, heights, fumes, odors, chemicals, or gases (Tr. 108). The vocational expert opined that no job would exist for such a claimant (Tr. 108).

Counsel's next hypothetical defined "moderate" as "more than a slight limitation but the individual is still able to function satisfactorily," " marked" as "serious limitation in the area" and "substantial loss in the ability to effectively function," and "extreme" as "a major limitation in this area" and "no useful ability to function in this area," and described that hypothetical claimant as having the following characteristics: (1) the age, education, and work experience of Plaintiff; (2) marked impairment in the ability to understand and remember simple instructions; (3) marked impairment in the ability to carry out simple instructions; (4) marked impairment in the ability to make judgments on simple work-related issues; (5) extreme impairment in the ability to understand or remember complex instructions; (6) extreme impairment in the ability to carry out complex instructions; (7) extreme impairment in the ability to make judgments on complex work-related issues; (8) marked impairment in the ability to interact appropriately with the public; (9) moderate impairment in the ability to interact appropriately with supervisors; (10) moderate impairment in the ability to interact appropriately with co-workers; and (11) extreme impairment in the ability to respond appropriately to usual work situations and the changes in a routine work setting (Tr. 109-10). The vocational expert opined that such a person would not be employable (Tr. 110).

In response to counsel's additional questions, the vocational expert testified that

employers would not tolerate absences of more than two per month on a continuous basis, that most employers would not tolerate unscheduled work breaks after a certain period of time, and that such a claimant would have difficulty getting through a probationary period in most employment settings (Tr. 110-11).

V.    FINDINGS OF THE ALJ

Judge Allen G. Erickson entered his decision on August 19, 2010, making the following findings of fact and conclusions of law:

1.    Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2014;

2     Plaintiff has not engaged in substantial gainful activity since May 29, 2009, the alleged onset date;

3.    Plaintiff has the following severe impairments: status post C2 fracture, lumbar degenerative disc disease, fibromyalgia, interstitial cystitis, status post closed head injury, and post-traumatic stress disorder;

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926);

5.    Plaintiff has the residual capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except that she can never climb ladders, ropes, or scaffolds, and she can only occasionally crawl, and climb ramps and stairs. The plaintiff can frequently but not continuously engage in overhead reaching bilaterally. She can understand, remember, and carry out detailed but not complex instructions while performing predictable tasks;

6.    Plaintiff is unable to perform any past relevant work (20 C.F.R. §§404.1565 and 416.965);

7.    Plaintiff was thirty-eight years old on the alleged disability onset date, which is defined as a younger individual at age 18-44 (20 C.F.R. §§ 404.1563 and 416.963);

8.    Plaintiff has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964);

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not the claimant has transferable job

skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2);

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a)); and

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from May 29, 2009 through August 19, 2010, the date of the ALJ's decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

Additionally, the ALJ concluded that Cynthia Mayberry, APRN, was not an acceptable medical source under the Commissioner's regulations (Tr. 23).

## VI. INTERSTITIAL CYSTITIS

Plaintiff first argues that the ALJ failed to consider her interstitial cystitis (IC), as required by Social Security Ruling 02-2p, when considering her mental impairments.

Social Security Rule 02-2p provides in part that:

If an individual has the medically determinable impairment IC that is "severe" . . . we may find that the IC medically equals a listing, if appropriate. (See 20 CFR 404.1525 and 416.925.) . . . We also may find in a title II claim, or an adult claim under title XVI, that the IC results in a finding that the individual is disabled based on his or her residual functional capacity (RFC), age, education, and past work experience.

An individual with IC also may report symptoms suggestive of a mental impairment (for example, the individual may say that he or she is anxious or depressed, having difficulties with memory and concentration, etc.). If the evidence supports a possible discrete mental impairment or symptoms such as anxiety or depression resulting from the individual's IC or the side effects of medication, we will develop the possible mental impairment. If the evidence does not establish a medically determinable mental impairment, but does establish the presence of symptoms such as anxiety or depression resulting from the individual's IC or side effects of medication, we will determine whether there are any work-related functional limitations resulting from the symptoms. We will address any work-related functional limitations at steps 4 and 5 of the sequential evaluation process.

* * *

As with any other medical condition, we will find that IC is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities. (For children applying for disability under title

34

XVI, we will find that IC is a "severe" impairment when it causes more than minimal functional limitations.) We also will consider the effects of any symptoms (such as pain or fatigue) that could limit functioning. (See SSR 85-28, "Titles II and XVI: Medical Impairments That Are Not Severe" and SSR 96-3p, "Titles II and XVI: Considering Allegations of Pain and Other Symptoms In Determining Whether a Medically Determinable Impairment Is Severe.") Therefore, we will find that an impairment(s) is "not severe" only if it is a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the individual's ability to do basic work activities (or, for a child applying under title XVI, if it causes no more than minimal functional limitations).

In this case, the ALJ found that Plaintiff's IC was a severe impairment (Tr. 16). He concluded, however, that Plaintiff's interstitial cystitis was moderate and was being effectively treated with medication (Tr. 20). The medical evidence of record supports this conclusion.

Specifically, on January 11, 2010, Plaintiff saw Dr. Boling regarding pelvic pain and heavy periods, and he observed Plaintiff's symptoms to be consistent with IC (Tr. 517). On February 18, 2010, following a cystoscopy, Dr. Boling described Plaintiff's IC as being of "a moderate nature" (Tr. 517). June 7, 2010, records reflect that Plaintiff was being treated with Amitriptyline and Elmiron for IC and that Plaintiff's urologist did not want to discontinue Amitriptyline or "switch[] to a different tricyclic due to its efficacy in this particular situation" (Tr. 597).

Finding that Plaintiff was not disabled based on IC alone, we next consider whether the evidence establishes a medically determinable mental impairment. As discussed more fully below, the ALJ did consider Plaintiff's depression and anxiety but found neither to be a medically determinable mental impairment. The record demonstrates the ALJ also considered any work-related functional limitations and concluded Plaintiff had mild restrictions. These restrictions were then accounted for in the sequential evaluation process. Plaintiff's motion for summary judgment is denied on this ground.

VII.    DEPRESSION AND ANXIETY

Plaintiff next maintains that the ALJ erred by determining that her depression was a

non-medically determinable impairment and in failing to consider her anxiety as a severe impairment. Defendant responds that such impairments must be shown by medically acceptable clinical or laboratory evidence, which does not exist here.

On the issue of depression, the ALJ wrote:

> Though the claimant complained of depression throughout the record (Exhibits B4F4, B6F4, B8F8, B23F11), she was never diagnosed by an acceptable medical source (Exhibits B8F4, B21F4) (see 20 CFR 404.1513(a) and 416.913(a)). Therefore, the undersigned finds that the claimant's alleged depression (Exhibit B8E2) is a non-medically determinable impairment.

(Tr. 17). On the issue of anxiety, the ALJ wrote:

> The claimant also testified regarding her mental status. She indicated that she feels agitated, easily startled, nervous, and cautious, secondary to PTSD and anxiety. Though she reportedly regresses to childhood during stressful situations and experiences panic attacks and nightmares two-to-three times per week, she receives counseling which "has been effective" (hearing record).

(Tr. 19).

In this case, Plaintiff saw Nurse Mayberry for her mental health concerns. On June 5, 2010, Nurse Mayberry filled out a MSS Mental evaluation and opined that Plaintiff had the following limitations: (1) marked limitations in understanding, remembering, and carrying out simple instructions, as well as making judgments on simple work-related decisions; (2) extreme limitations in understanding, remembering, and carrying out complex instructions; (3) moderate limitations in interacting appropriately with supervisors and co-workers; (4) marked limitations in interacting appropriately with the public; (5) extreme limitations in responding appropriately to usual work situations and to changes in a routine work setting; (6) ability to focus and concentrate; depression, which saps her energy; (7) severe PTSD with panic attacks (Tr. 564-66).

Nurse practitioners are not "acceptable medical sources," but are instead defined as "other sources" within the regulations. See 20 C.F.R. §§ 404.1527(d), 416.927(d). See also Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003). Opinions from "other sources" should

36

be evaluated according to the following factors: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion. See Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

A review of the records reveals that Nurse Mayberry's treatment notes are comprised primarily of Plaintiff's self-reported symptoms. Furthermore, her opinions are inconsistent with the other evidence of record. Dr. Tichenor opined that Plaintiff's "ability to understand and remember instructions, to attend to and complete tasks, and to interact socially and adapt are likely somewhat lowered but [are] not precluded." (Tr. 451). Importantly, he also noted that Plaintiff had been uncooperative during his assessment. Her GAF was 70, indicating only mild symptoms. Plaintiff, herself, testified at the hearing that her mental status had improved with counseling (Tr. 66). Brown v. Astrue, 611 F.3e 941, 955 (8th Cir. 2010)(quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). I find no error with the ALJ's conclusions on this issue.

VIII.    MEDICALLY EQUAL LISTINGS

Plaintiff next complains that the ALJ erred in determining that her impairments did not meet or equal the requirements of sections 12.02, 12.04, or 12.06 of the Listing impairments. In response, Defendant argues that the ALJ did consider sections 12.02 and 12.06, but found that Plaintiff's impairments, alone or in combination, failed to meet or medically equal the listings' requirements.

A.    Listing 12.02 - Organic Mental Disorders

Listing 12.02 deals with "[p]sychological or behavioral abnormalities associated with a

dysfunction of the brain." 20 C.F.R. Pt. 404, Subpt P., App. 1, § 12.02 (2011). Section 12.02 further requires "[h]istory and physical examination or laboratory tests [that] demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." <u>Id.</u>

In this case, the record is completely devoid of evidence that would support a finding that Plaintiff's impairment(s) meet Listing 12.02. Plaintiff has never been diagnosed with an organic disorder. She has never been referred to a neurologist and diagnostic tests and/or imaging have not been performed or even requested. As a result, the ALJ did not err in finding that Plaintiff did not meet the requirements of Listing 12.02.

### B.    Listing 12.04 - Affective Disorders

Listing 12.04 pertains to mental impairments "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." The requisite level of severity is met "when the requirements in both A and B are satisfied, or when the requirements in C are satisfied":

A.    Medically documented persistence, either continuous or intermittent, of one or more of the following:
1.    Depressive syndrome characterized by at least four of the following:
a.    Anhedonia or pervasive loss of interest in almost all activities; or
b.    Appetite disturbance with change in weight; or
c.    Sleep disturbance; or
d.    Psychomotor agitation or retardation; or
e.    Decreased energy; or
f.    Feelings of guilt or worthlessness; or
g.    Difficulty concentrating or thinking; or
h.    Thoughts of suicide; or
i.    Hallucinations, delusions, or paranoid thinking;
.    .    .
AND
B.    Resulting in at least two of the following:
1.    Marked restriction of activities of daily living; or
2.    Marked difficulties in maintaining social functioning; or
3.    Marked difficulties in maintaining concentration, persistence, or pace; or

38

4.     Repeated episodes of decomposition, each of extended duration;

OR

C.     Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

     1.     Repeated episodes of decomposition, each of extended duration;

     2.     A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate; or

     3.     Current history of 1 or more years' ability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

In this case, the record does not contain evidence that would satisfy four of the "A" criterion. Even if it did, however, both "A" and "B" must be satisfied to meet the listing and the record does not contain evidence to satisfy the requirements under "B". Only Nurse Mayberry opined that Plaintiff had any marked limitations, and the ALJ properly discounted her opinion as discussed above. Both the documentary evidence and Plaintiff's own testimony demonstrate her limitations were less severe. There is absolutely no evidence of record that Plaintiff experienced any episodes of decomposition or was unable to function outside a supportive living arrangement and thus does not satisfy the requirements of "C". The ALJ did not err in determining Plaintiff did not meet Listing 12.04.

C.    Listing 12.06 - Anxiety Related Disorders

Listing 12.06 requires Plaintiff to meet both the "A" and "B," or the "A" and "C," requirements.

A.     Medically documented findings of at least one of the following:

     1.     Generalized persistent anxiety accompanied by three of the four following signs or symptoms:

          a.     Motor tension; or

          b.     Autonomic hyperactivity; or

          c.     Apprehensive expectations; or

          d.     Vigilance and scanning; or

     2.     A persistent irrational fear of a specific object, activity, or situation resulting in a compelling desire to avoid that object, activity, or situation; or

39

3.      Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week; or

4.      Recurrent obsessions or compulsions which are a source of marked distress; or

5.      Recurrent and intrusive recollection of a traumatic experience which are a source of marked distress.

AND

B.      Resulting in at least two of the following:

1.      Marked restriction of activities of daily living; or

2.      Marked difficulties in maintaining social functioning;

3.      Marked difficulties in maintaining concentration, persistence, or pace; or

4.      Repeated episodes of decomposition, each of extended duration.

OR

C.      Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.06 (2011).

Again, the record does not contain medically documented findings that would satisfy the "A" requirements; therefore, the "B" requirements are irrelevant. The record similarly fails to show symptoms consistent with the "C" requirements. The ALJ did not err in finding that Plaintiff did not meet the requirements of Listing 12.06.

IX.     WEIGHT TO MEDICAL OPINIONS

Plaintiff argues that the ALJ erroneously failed to adopt the opinions of her treating physician, Kenneth D. Richards, D.O., and her treating nurse practitioner, Cynthia Mayberry, APRN. In response, Defendant states that the ALJ (1) considered Dr. Richards's opinion but discounted it because there was no supporting evidence in his medical records, and (2) properly rejected Ms. Mayberry's opinion because she was not an acceptable medical source and it was not supported by the medical record.

The ALJ's treatment of Nurse Mayberry's opinions was not in error as discussed above, supra VII. With regard to Plaintiff's treating physician, Dr. Richards, the ALJ stated:

As for the physical opinion evidence, the undersigned has considered the opinion of Ken Richards, D.O., the claimant's treating physician (SSR 96-2p). In June

40

2010, Dr. Richards opined that the claimant can occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds. He then opined that [the] claimant can stand and/or walk less than 2 hours in an 8-hour workday, and sit less than 6 hours in an 8-hour workday, with some postural, manipulative, and environmental limitations (Exhibits B19F2-5). However, the undersigned affords little weight to Dr. Richards'[s] opinion because he provided no objective medical support for his opinion. Indeed, Dr. Richards[] failed to connect the claimant's limitations to specific physical/mental impairments or symptoms.

(Tr. 22).

The opinion of a treating physician is "generally given controlling weight, but is not inherently entitled to it." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) (quoting Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006)). An ALJ may elect not to give controlling weight to a treating physician when their opinions are "not supported by diagnoses based on objective evidence" or if the opinions are "inconsistent with or contrary to the medical evidence as a whole." Id. (internal citations omitted). An ALJ may also "discount an opinion of a treating physician that is inconsistent with the physcian's clinical treatment notes." Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). Checklists are of limited evidentiary value. Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010); Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991).

Dr. Richards opined Plaintiff could (1) lift 20 pounds occasionally and l0 pounds frequently; (2) stand or walk less than 2 hours in an 8-hour workday; (3) sit less than about 6 hours in an 8-hour workday; (4) was limited in upper extremities; (5) could never climb, balance, crouch, crawl, or stoop, and occasionally kneel; (6) was limited to occasionally in reaching, handling, fingering, and feeling; and (7) was limited in temperature extremes, dust, vibration, humidity or wetness, hazards, fumes, and the like (Tr. 559-62). These opinions are inconsistent with other medical evidence.

Plaintiff's August 30, 2010, examination revealed normal strength in all muscle groups, intact sensation, brisk reflexes and that she could walk on her toes and heels without difficulty

(Tr. 619).  A May 12, 2010 CT scan showed a well-healed C2 vertebral body with no signs of residual fracture (Tr. 619).  An August 31, 2010 MRI also showed no abnormality (Tr. 619, 622-23).  Dr. Mollman stated Plaintiff's neck condition should not be a limitation to her returning to work and that there were no objective findings that would suggest a significant disability (Tr. 620-21).

Additionally, Dr. Richards' Medical Source Statement is nothing more than a series of checkmarks without any attempt to tie the Plaintiff's limitations to a particular condition or to explain, based on his treatment of Plaintiff, how the alleged limitations were affected by those conditions.  Plaintiff's motion for summary judgment is denied on this basis.

X.      OPINION OF PLAINTIFF'S SISTER, DARA DONOVAN

Plaintiff next complains that the ALJ mischaracterized the testimony of her sister, Dara Donovan, about Plaintiff's capacity to work.   Defendant responds that the ALJ did not misrepresent the sister's testimony but, in any case, gave it little weight because the issue is one reserved for the Commissioner.

With regard to Dara Donovan's testimony, the ALJ stated:

> In January 2010, Ms. Donovan was asked whether the claimant is capable of work. Ms. Donovan replied 'yes, she can work,' (Exhibit B9F2). The undersigned concurs with Ms. Donovan's opinion that the claimant is not disabled. However, the undersigned affords it little weight because her opinion is on an issue specifically reserved for the Commissioner.

(Tr. 22).

On January 26, 2010, Dana L. Donovan, Plaintiff's sister, completed a questionnaire for the Social Security Administration, Office of Hearings and Appeals (Tr. 473-75). In the questionnaire, Ms. Donovan was asked: "Can the Claimant work?" (Tr. 473). Ms. Donovan's complete answer to the question was: "Yes she can work." (Tr. 473). In the next question, Ms. Donovan was asked: "What is it about his/her mental or physical problems that prevents him/her from working?" (Tr. 473). In response, Ms. Donovan wrote: "When working Denice

has a very stressful time. It causes physical pain from bending, lifting, and constant movement. Mentally stress causes severe migra[i]nes that last for days at a time." (Tr. 473).

I find no issue here requiring reversal.

XI.     PLAINTIFF'S FIBROMYALGIA

Plaintiff next argues that the ALJ failed to properly consider the severity of her fibromyalgia in accordance with agency policies, stating "There is no indication that the ALJ considered the effects of fibromylagia at all in his RFC assessment." Plaintiff's argument is disproved by the ALJ's opinion.

On the issue of fibromyalgia, the ALJ expressly stated that he "considered the effects of [Plaintiff's] fibromyalgia signs and symptoms under the musculoskeletal body system, neurological body system, and other body systems" in concluding that it was a severe impairment (Tr. 16-17). In later assessing Plaintiff's residual functional capacity, the ALJ stated he "considered [Plaintiff's] treatment history, the objective clinical findings, [Plaintiff's] subjective complaints, the medical opinions, and all of the evidence of record" (Tr. 23). Plaintiff's motion for summary judgment is thus denied on this ground.

XII.     VOCATIONAL EXPERT'S TESTIMONY

Finally, Plaintiff maintains that the ALJ did not rely on the vocational expert's testimony in response to the hypothetical questions that (1) incorporated the physical restrictions outlined by Dr. Richards; (2) incorporated the mental restrictions outlined by Nurse Mayberry; and (3) assumed the likelihood of absences of more than two per month on a continuous basis.

A hypothetical question asked of a vocational expert is properly formulated when it sets forth impairments "supported by substantial evidence in the record and accepted as true by the ALJ." Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005). The ALJ may exclude a claimant's complaints from a hypothetical question when the ALJ has reason to discredit them. Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004).

43

As discussed above, the ALJ properly refused to accept as controlling the opinions of Dr. Richards and Nurse Mayberry. He was, therefore, not required to accept the vocational expert's testimony that included such opinions. The ALJ correctly relied on the vocational expert's responses to the hypothetical questions containing credible limitations, and found Plaintiff could perform sedentary unskilled work existing in significant numbers in the national economy (Tr. 106). I find no error on this issue.

XIII.    CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding that Plaintiff is not disabled under the Act. Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


                                        /s/ Robert E. Larsen
                                        ROBERT E. LARSEN
                                        United States Magistrate Judge

Kansas City, Missouri
September 28, 2012

Case 5:11-cv-06072-REL   Document 16   Filed 09/28/12   Page 44 of 44